# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| **IN RE: SHALE OIL ANTITRUST LITIGATION** | Case No. |
| | Related to: 1:24-md-03119-MLG-LF |
| | *This Document Relates to All Actions* |

**COUNTY OF SAN MATEO,**

**CITY OF SAN JOSE**

      **Plaintiffs,**

       **v.**

**HESS CORPORATION.**

**EXXON MOBIL CORPORATION.**

**PERMIAN RESOURCES CORP. f/k/a CENTENNIAL RESOURCE DEVELOPMENT, INC.**

**CHESAPEAKE ENERGY CORPORATION.**

**CONTINENTAL RESOURCES INC.**

**DIAMONDBACK ENERGY, INC.,**

**EOG RESOURCES, INC.,**

**OCCIDENTAL PETROLEUM CORPORATION**

 **PIONEER NATURAL RESOURCES COMPANY.**

      Defendants.

**CLASS ACTION**
**JURY TRIAL DEMANDED**

   **1:24-CV-01000**

# CLASS ACTION COMPLAINT

<u>**Table of Contents**</u>

I.    INTRODUCTION ................................................................................................. 1

II.   PARTIES ........................................................................................................... 5

III.  JURISDICTION, VENUE, AND COMMERCE ................................................ 8

IV.   FACTUAL ALLEGATIONS ............................................................................... 9

  A.  Shale Oil ......................................................................................................... 9

  B.  History of OPEC ........................................................................................... 10

  C.  U.S. Shale Oil Production Changed the Oil and Gas Industry .................... 11

  D.  OPEC's Price War against Cowboyistan ..................................................... 14

  E.  OPEC Changes its Tactics ........................................................................... 16

  F.  Defendants' Cooperative Relationship with OPEC Takes Shape ............... 21

  G.  2022-2023: Defendants' Coordination with OPEC Intensifies ................... 24

  H.  Factors that Indicate Defendants' Collusion to Restrict the Production of Crude Oil 27

V.    DEFENDANTS' INFLUENCE ON OIL PRICE CONTROL ............................ 28

VI.   ADDITIONAL INDICATORS OF COLLUSION ............................................. 30

VII.  INJURY RELATED TO ANTITRUST .............................................................. 32

  A.  Defendants' Agreement to Constrain Shale Oil Production Has Inflated and Influenced the Price of Crude Oil Throughout the Class Period. ....................................... 32

  B.  Defendants' Agreement to Limit Shale Oil Production Has Driven Up the Prices of Gasoline and Diesal Fuel Purchased by the Plaintiffs and the Classes ............................ 33

VIII. CLASS ALLEGATIONS ................................................................................. 38

IX.   CLAIMS FOR RELIEF ................................................................................... 41

  COUNT 1: VIOLATION OF THE SHERMAN ACT ........................................... 41

  COUNT 2: ALABAMA ....................................................................................... 43

  COUNTS 3 & 4: ARIZONA ............................................................................... 44

  COUNTS 5 & 6: CALIFORNIA ......................................................................... 44

  COUNTS 7 & 8: COLORADO ........................................................................... 45

  COUNT 9: CONNECTICUT .............................................................................. 46

  COUNTS 10 & 11: DISTRICT OF COLUMBIA ................................................ 46

  COUNTS 12 & 13: FLORIDA ............................................................................ 47

  COUNT 14: HAWAII ......................................................................................... 48

  COUNTS 15 & 16: ILLINOIS ............................................................................ 48

  COUNT 17: IOWA ............................................................................................. 49

**COUNT 18: KANSAS** ................................................................................................ 49

**COUNT 19: MAINE** .................................................................................................. 50

**COUNTS 20& 21: MARYLAND** ............................................................................... 50

**COUNTS 22 & 23: MICHIGAN** ................................................................................ 51

**COUNTS 24 & 25: MINNESOTA** ............................................................................. 51

**COUNT 26: MISSISSIPPI** ......................................................................................... 52

**COUNTS 27 & 28: NEBRASKA** ............................................................................... 52

**COUNTS 29 & 30: NEVADA** ..................................................................................... 53

**COUNTS 31 & 32: NEW HAMPSHIRE** .................................................................. 53

**COUNTS 33 & 34: NEW MEXICO** .......................................................................... 54

**COUNT 35: NEW YORK** ........................................................................................... 54

**COUNT 36: NORTH CAROLINA** ........................................................................... 55

**COUNT 37: NORTH DAKOTA** ................................................................................ 55

**COUNTS 38 & 39: OREGON** .................................................................................... 56

**COUNTS 40 & 41: RHODE ISLAND** ...................................................................... 56

**COUNTS 42 & 43: SOUTH DAKOTA** ..................................................................... 57

**COUNT 44: TENNESSEE** ......................................................................................... 58

**COUNT 45: UTAH** ..................................................................................................... 58

**COUNT 46: VERMONT** ............................................................................................ 58

**X.**      **PRAYER FOR RELIEF** ................................................................................. 59

**XI.**     **JURY TRIAL DEMANDED** ......................................................................... 60

Plaintiffs County of San Mateo, a county in California and City of San Jose, a city in California, on behalf of themselves and all similarly situated persons and entities, bring this antitrust class action lawsuit for treble damages and injunctive relief against Defendants Hess Corporation, Exxon Mobil Corporation, Permian Resources Corporation (f/k/a Centennial Resource Development, Inc.); Chesapeake Energy Corporation; Continental Resources Inc.; Diamondback Energy, Inc.; EOG Resources, Inc.; Occidental Petroleum Corporation; and Pioneer Natural Resources Company (collectively "Defendants").

## I.    **INTRODUCTION**

1.    Shale oil is crude oil produced from petroleum-bearing formations with low permeability that are hydraulically fractured – or "fracked" – to produce oil. This case is about a conspiracy to restrict the production of crude oil by the major U.S. producers of shale oil, their Wall Street investors, the Organization of the Petroleum Exporting Countries ("OPEC"), and certain non-OPEC member countries aligned with OPEC, called "OPEC+."

2.    Defendants' conspiracy has had and continues to have the purpose and effect of fixing, raising, and maintaining the price of crude oil in and throughout the United States of America. Defendants' agreement to limit their respective shale production volumes has had, and continues to have, the effect of fixing and/or stabilizing at an artificially high-level U.S. (and global) crude oil prices, which in turn fixed and/or stabilized gasoline and diesel fuel prices in the United States at an artificially high level.

3.    Defendants' conspiracy had a massive impact on retail and rack rate gas and diesel prices. This is not a situation where Defendants slightly raised prices by small amounts, and slowly accumulated millions of dollars by cheating their customers here and there. The impact was much larger. Though the exact effects of the conspiracy are yet to be determined, one can get a rough idea of the impact by reference to this graph.[1]

---

[1] Source www.eia.gov



4.      Defendants' cartel is a per se unlawful restraint of trade under numerous state antitrust and competition laws. Plaintiffs and the Classes suffered substantial harm as a result of the supra-competitive prices they paid for gasoline or diesel for commercial use as a direct and proximate result of the cartel to constrain domestic production of shale oil in the United States. Plaintiffs brings this suit to recover that loss.

5.      The U.S. Federal Trade Commission ("FTC") conducted an investigation and found that the former CEO and founder of Defendant Pioneer Natural Resources Company ("Pioneer"), Scott Sheffield ("Sheffield") "campaigned to organize anticompetitive coordinated output reductions between and among U.S. crude oil producers, and others, including" OPEC and OPEC+. See Complaint ¶ 1, *In the Matter of Exxon Mobil Corporation* (May 2024) ("FTC Compl."). The FTC's investigation included the review of Sheffield's private correspondence and public statements, revealing that Sheffield's "goal in recent years at Pioneer has been to align U.S. oil production with OPEC and OPEC+ country output agreements, thereby cementing the cartel's position and sharing in the spoils of its market power." See FTC Compl. ¶ 3. Sheffield

"held repeated, private conversations with high-ranking OPEC representatives assuring them that Pioneer and its Permian Basin rivals were working hard to keep oil output artificially low." FTC Compl. ¶ 5 (citing a WhatsApp chat). "This was not a one-off event but rather part of Mr. Sheffield's sustained and long-running strategy to coordinate output reductions[.]" *Id.* ¶ 6. The revealed coordination led the FTC to bar Sheffield from joining Exxon Mobil's Board of Directors – a term of Exxon's agreement to acquire Pioneer in 2024 –because the mere act of his joining the Board itself violated the antitrust laws. See FTC Compl. ¶ 2. The FTC has since opened a full-scale investigation into the U.S. shale oil industry, focused on the private communications of industry executives. *See* Mitchell Ferman, Leah Nylen, and Jennifer Dlouhy, "FTC Eyes Oil Bosses' Texts for Signs of Collusion With OPEC," Bloomberg (July 19, 2024). It has also referred the matter to the U.S. Department of Justice for a potential criminal prosecution. See Liz Hoffman and Gina Chon, "FTC plans to recommend a possible criminal case against ex-Pioneer CEO," Semafor (May 2, 2024).

6.    The County of San Mateo and the City of San Jose ("Plaintiffs") are a victims of this conspiracy to limit oil production. Plaintiffs seek to represent classes of persons and entities that, like Plaintiffs, paid artificially inflated prices for motor vehicle fuel, gasoline, or diesel, that they purchased for commercial use. Plaintiffs and others similarly situated to it paid more than they should have for the products crude oil is produced to make: "light petroleum products," meaning motor gasoline, distillate fuel (diesel and home heating oil), and jet fuel. Plaintiffs bring this antitrust lawsuit on its own behalf and on behalf of similarly situated purchasers to hold the Defendants accountable, reclaim the losses incurred, and obtain injunctive relief that will end this collusion and reform the market.



https://anundergroundminer.com/blog/quick-guide-to-oil-shale



https://www.wsj.com/articles/u-s-shale-is-the-key-to-a-renewable-future-decarbonization-oil-gas-carbon-emissions-ukraine-renewable-11647546675

## II.    PARTIES

7.      Plaintiff, **County of San Mateo** is a county and a political subdivision of the State of California. San Mateo is the 14th most populous county in California, with a population of more than 770,000 residents. During the relevant time period, Plaintiff purchased light petroleum products, and it was injured by the illegal conduct described herein by paying more for those products that it would have but for Defendants' conduct.

8.      Plaintiff, **City of San Jose, California** is a municipal corporation authorized to bring the causes of action brought herein. The City is a California Charter City and municipal corporation, duly organized and existing by virtue of the laws of the State of California. During the relevant time period, January 1, 2021, to the time the unlawful conduct and its anticompetitive effects cease to persist, ("Relevant Time Period"). Plaintiff purchased light petroleum products, and it was injured by the illegal conduct described herein by paying more for those products than it would have but for Defendants' conduct.

9.      Defendant **Hess Corporation** ("Hess") is a publicly traded Delaware Corporation headquartered in New York, New York. It is a significant producer of crude oil from shale oil formations in North Dakota. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "HES" ticker symbol.

10.     Defendant **Exxon Mobil Corporation** ("Exxon") is a publicly traded New Jersey Corporation headquartered near Houston TX, in Spring TX. It is a significant producer of crude oil from shale oil formations, largely in the Permian Basin, Bakken Formation, Woodford Shale, Caney Shale and the Gulf of Mexico. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "XOM" ticker symbol.

11.     Defendant **Permian Resources Corporation** is a publicly traded Delaware corporation headquartered in Midland, Texas. It is a major producer of crude oil from shale oil

formations, largely in the Permian Basin in Texas and New Mexico. Permian was formed in 2022 in a transaction between Centennial Resource Development, Inc. ("Centennial") and Colgate Energy Partners III, LLC. During most of the period relevant to this complaint, it was known as Centennial. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "PR" ticker symbol.

12.    Defendant **Chesapeake Energy Corporation** ("Chesapeake") is a publicly traded Oklahoma Corporation headquartered in Oklahoma City, Oklahoma. It is a major producer of crude oil from shale oil formations, with operations in Louisiana and Pennsylvania. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the NASDAQ Stock Market under the "CHK," "CHKEW," "CHKEZ," and "CHKEL" ticker symbols.

13.    Defendant **Continental Resources Inc.** ("Continental") is an Oklahoma Corporation headquartered in Oklahoma City, Oklahoma. It is a significant producer of crude oil using shale oil formations, with operations in North Dakota, Montana, Oklahoma, Texas, and Wyoming. Continental sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Until November 22, 2022, its common stock traded on the New York Stock Exchange under the "CLR" ticker symbol. Thereafter, the company became privately owned by Harold Hamm, the company' founder, who purchased it through a series of take-private transactions with Omega Acquisition Inc.

14.    Defendant **Diamondback Energy, Inc.** ("Diamondback") is a publicly traded Delaware Corporation headquartered in Midland, Texas. It is a major producer of crude oil using shale oil formations in Texas. Diamondback sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the NASDAQ Stock Market under the "FANG" ticker symbol.

15.    Defendant **EOG Resources, Inc.** ("EOG") is a publicly traded Delaware Corporation headquartered in Houston, Texas. EOG is a major producer of crude oil from oil shale

formations with operations covering North Dakota, Wyoming, Colorado, Oklahoma, Texas, New York, Pennsylvania, and New Mexico. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "EOG" ticker symbol.

16.    Defendant **Occidental Petroleum Corporation** ("Occidental") is a publicly traded Delaware Corporation headquartered in Houston, Texas. It is a major producer of crude oil from shale oil formations in Colorado, Texas, and New Mexico. Occidental sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Occidental's common stock and warrants to purchase common stock trade on the New York Stock Exchange under the "OXY" and "OXY WS" ticker symbols, respectively.

17.    Defendant **Pioneer Natural Resources Company** ("Pioneer") is a publicly traded Delaware Corporation headquartered in Irving, Texas. Pioneer is a significant producer of crude oil from shale oil formations in Texas. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "PDX" ticker symbol.

18.    Each and every Defendant was a co-conspirator with the other Defendants. Each committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

19.    "Defendants," as used herein means each of Centennial, Chesapeake, Continental, Diamondback, EOG, Hess, Exxon, Occidental, and Pioneer; unless stated otherwise, where an action by "Defendants" is alleged, it is alleged that each Defendant undertook the alleged action. "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, or agents.

20.    Though each Defendant may have subsidiaries and affiliates with separate corporate forms, each Defendant's officers, employees and agents habitually refer to the Defendant and its subsidiaries collectively, not making legal distinctions among related corporate entities.

Whenever reference is made to any act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

21.    Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions, for whom they are liable.

22.    Co-conspirators known and unknown willingly participated in the alleged conspiracy and acted in furtherance thereof.

## III.    JURISDICTION, VENUE, AND COMMERCE

23.    This Court has subject matter jurisdiction over this action pursuant to Sections 1 the Sherman Act, 15 U.S.C. § 1 and Section 16 of the Clayton Act, 15 USC § 26, and 28 U.S.C. §§ 1331 and 1337(a).

24.    This Court has jurisdiction over the state law claims (1) under 28 U.S.C. § 1367, because the state law claims are so related to the federal claim that it forms part of the same case or controversy, and (2) under 28 U.S.C. § 1332, because the amount in controversy for the Classes exceeds $5,000,000 and because there are members of the Classes who are citizens of a different state than the Defendants.

25.    The Defendants are subject to personal jurisdiction in this Court under (without limitation): (1) 15 U.S.C. § 22; (2) New Mexico's long-arm statute, N.M. Stat. § 38-1-16; and (3) the conspiracy theory of jurisdiction. Each Defendant was formed in or has its principal place of business in the United States, transacted business throughout the United States, including in this District, and had substantial contacts with the United States, including in this District, and committed overt acts in furtherance of their illegal scheme and conspiracy in the United States.

26.    The conspiracy was carried out in substantial part in the United States, and was directed at, and had the intended and actual effect of causing injury to, the Plaintiffs and Class members residing in, located in, or doing business in the United States.

27.    The Defendants' activities, and those of their co-conspirators, were within the flow of, and were intended to and did have a substantial effect on, foreign and interstate commerce.

28.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 U.S.C. §§ 1391(b) and (c) because during the class period the Defendants transacted business and had agents in this District, a substantial part of the events or omissions giving rise to these claims occurred in this District, and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

29.    Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

30.    By reason of the unlawful activities alleged herein, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed class members. Defendants, directly and through their agents, engaged in activities affecting all states.

31.    Defendants' conspiracy, wrongful anticompetitive conduct, and substantial anticompetitive effects described herein proximately caused injury to Plaintiffs and members of the Classes.

## IV.    FACTUAL ALLEGATIONS

### A.    Shale Oil

32.    Shale oil is a relatively new business. It was produced in connection with major commercial "fracking" formation around 1988. However, volumes of shale oil remained relatively insubstantial until around 2011.

33.     Shale oil is a high-quality crude oil found between layers of shale rock, impermeable mudstone, or siltstone that can be extracted, refined, and used to produce gasoline, diesel fuel, and other commercial products sold in the United States. Shale oil is produced by fracturing the rock formations that contain the lawyers of oil in a process known as hydraulic fracturing, or more commonly, "fracking."

34.     Crude oil is the main input into gasoline and diesel fuel. The price of crude oil is the main factor involved in establishing the price of gasoline and diesel fuel at the pump. Approximately 90% of variation in the price of these fuels is directly related to the price of crude. A conspiracy to raise crude oil prices is also a conspiracy to raise the prices of gasoline and diesel fuel.

35.     Shale oil, along with other crude oil, is sold to refineries. Refineries purchase and combine shale oil produced by Defendants with other shale oil, as well as crude oil extracted from traditional drilling methods. The refineries then refine the crude oil into gasoline, diesel, or other petroleum-based products. Crude oil is the primary upstream input in gasoline and diesel fuel.

36.     Gasoline and diesel fuel are then transported to storage terminals, where they are stored and blended prior to sale to gas stations for onward sale to members of the Classes.

37.     Refined gasoline and diesel fuel is transported to storage terminals, where the fuel is stored and blended before sale to gas stations and truck stops that make up the over 145,000 retail fuel outlets in additional to wholesale outlets across the U.S., for onward sale for commercial use to members of the Classes. Today, shale oil represents nearly 2/3 of the onshore production of crude oil in the United States.[2]

**B.      History of OPEC**

38.     OPEC is an intergovernmental organization first formed in 1960. It is comprised of 13 oil-producing member nations. Its member nations are: (1) Saudi Arabia, (2) Iran, (3) Iraq, (4) Kuwait, (5) Venezuela, (6) Indonesia, (7) Libya, (8) UAE, (9) Algeria, (10) Nigeria, (11)

---

[2] How Much Shale (Tight) Oil is Produced in the United States?, EIA (Mar. 27, 2023), https://www.eia.gov/tools/faqs/faq.php?id=847&t=6.

Equatorial Guinea, (12) Congo, and (13) Angola. OPEC cartelizes the production of oil to allow its members to extract oligopolistic prices in the oil market. OPEC has historically exerted market power over global oil prices by increasing or decreasing the production levels of its member nations.

39.    In the past, OPEC members have claimed sovereign immunity to the Sherman Act. Further, the United States has not attempted to prosecute OPEC or its member nations under antitrust laws. OPEC nations control almost 80% of the world's proven crude oil reserves and close to 40% of the world's oil production. By coordinating its members' production levels in response to demand and other policy considerations, OPEC effectively controlled prices. This forces other oil producers to make production decisions based on those prices.

40.    In around the mid-2010s, OPEC lost a substantial portion of its control over prices as a major shale oil supply from the United States hit the global market. As a result, OPEC could no longer sufficiently maintain prices by lowering production without losing substantial market share to other global producers and shale-oil competitors. A two-year price war with U.S. shale oil producers ensued.

41.    In order to reinforce its market power, OPEC signed agreements with ten additional countries beginning in 2016. These ten additional countries are known as OPEC+ and include Russia, Mexico, and Kazakhstan. OPEC and OPEC+ coordinate to agree on crude oil production levels on a country-level basis to limit their collective output. This expanded cartel controls nearly 60% of crude oil production worldwide.

42.    Even with the addition of OPEC+, the emergence of U.S. shale oil producers has reduced OPEC's dominance on the global oil market. This has driven OPEC to make room at the table for additional oil producers, including Defendants.

C.    **U.S. Shale Oil Production Changed the Oil and Gas Industry.**

43.    In the early 2000s, the introduction of shale drilling - also known as fracking - changed the entire oil and gas industry. U.S. oil production had been falling prior to 2008 for approximately 30 years until the advancement of fracking. The years following 2008 account for

the fastest increase in domestic crude oil production in U.S. history, known as the "Shale Revolution."[3]

44.     Innovations in fracking and drilling technology including improvements in horizontal drilling, 3-dimensional seismic imaging, and hydraulic fracturing improved the efficiency of drilling and allowed independent oil producers in the U.S. ("Independents") to produce hydrocarbons economically. Between 2008 and 2015, U.S. total oil production grew from 6.8 million barrels to approximately 12.8 million barrels a day.[4] This number grew to 17.1 million barrels a day by 2019 which put the U.S. ahead of Saudi Arabia and Russia as the world's largest producer.[5]

45.     The development of horizontal drilling was particularly significant in helping grow U.S. oil production. Horizontal drilling allowed a single well pad to collect hydrocarbons from a large area while traditional vertical drilling collects oil from only one point.[6] The increased production from horizontal drilling along with new imaging technologies and improvements in computer technology significantly increased well productivity by allowing shale companies to more accurately target productive formations.[7]

46.     Before the viability of shale fracking, massive conventional projects dominated the oil and gas industry. These projects often required years of construction and complicated planning to reach massive reservoirs that would produce large quantities over time. Shale drilling on the other hand, usually involves efficiently drilling more small and unproductive wells on a short timeline. The major technological advances in shale drilling along with hundreds of smaller innovations in drilling technology and business logistics made shale drilling even more

---

[3] *See* Zhongmin Wang and Alan Krupnik, *A Retrospective Review of Shale Gas Development in the United States: What Led to the Boom?* (Resources for the Future Discussion Paper 13-12, Apr. 2013) at 1, https://web.archive.org/web/20150319084508/http://www.rff.org/RFF/documents/RFF-DP-13- 12.pdf.
[4] *See* Javier Blas, "*Wall Street Is Finally Going to Make Money Off the Permian*," BLOOMBERG (April 24, 2023), https://www.bloomberg.com/opinion/articles/2023-04-24/higher-oil-prices-means-wall-street-s-shale-investments-will-finally-pay-off?embedded-checkout=true.
[5] *Id.*
[6] *See* Lynn Helms, *Horizontal Drilling*, N.D. DEPT. OF MINERAL RESOURCES NEWSLETTER (Winter 2008), https://www.dmr.nd.gov/ndgs/documents/newsletter/2008Winter/pdfs/Horizontal.pdf.
[7] *See* Wang & Krupnick, *supra* n.7, at 10.

economically feasible by decreasing the capital outlay needed to reach shale oil and gas. These innovations are shown by the graphic below. [8]



47.    These technological and business logistics innovations were developed beginning in 2000 and upended natural gas markets by around 2005 or 2006. By the 2010s, companies had already developed very efficient drilling methods. U.S. shale oil producers became major competitors with OPEC because the production of crude oil from shale oil wells were more responsive to changing prices and real-time conditions than traditional drilling methods because it required smaller capital commitments. In contrast, traditional drilling methods were decades-long investments that require substantially more lead time and construction before production.

48.    All these developments gave U.S. Independents the ability to control oil prices and compete with OPEC. U.S. Independents could now efficiently and sufficiently replace supply held back by OPEC production quotas, take advantage of oil prices reaching economically viable levels

---

[8]  https://www.fractracker.org/resources/oil-and-gas-101/process/

by increasing production, and decrease the monopoly rents OPEC could collect from their control of market supply.

49.    While U.S. shale oil production has come to rival OPEC and OPEC+ nations, U.S. shale producers are subject to the Sherman Act. Thus, prices and production levels were not set throughout the industry because U.S. shale producers were comparatively small and competitive with OPEC and each other.

50.    When U.S. shale oil established its presence in the global oil scene in the early to mid-2010s, it threatened the OPEC's decades-long market control of the industry. The competition levied by U.S. shale producers usurped Saudi Arabia as a swing producer and diminished OPEC's set cartel price premiums. The U.S. shale oil industry is referred to as "Cowboyistan" because of its wild West approach to drilling and its power as an oil producer.

51.    Defendants are among the largest Independents and have acted as "swing producers" since the shale boom in the global market. This means Defendants had the ability to adjust shale oil production levels quickly in response to market conditions and influence the price of crude oil.

52.    In order to be successful as an Independent, you must specialize in "racing." Independents race to acquire rights to drill in newly discovered shale plays, drill wells as fast as possible, and bring wells into production by securing fracturing and production services. The profitability of shale oil projects depends on timing and volume.

**D.    OPEC's Price War against Cowboyistan**

53.    OPEC is composed of sovereign nation-states that heavily rely on crude oil prices for their GDP. Confronted with significant new competition from Defendants, OPEC was unwilling to give up its half-century long pricing power to U.S. shale producers. In early 2014, OPEC determined that the Independents had gained too much of OPEC's market share and started to leverage its control of the industry to destroy the U.S. shale industry.

54.    OPEC launched its price war by managing its production levels to push oil prices down to a level that was high enough for the political needs of its members but would make U.S.

shale oil economically unviable. They did this by flooding the market to drive out U.S. producers. This caused oil prices to plunge to a low of $27 per barrel. OPEC did this to maintain the global oversupply of crude oil in order to claw back market share it had lost to Independents. This started more than two years of open global competition (the "OPEC Price War") during which OPEC nations sold oil into the market at prices not seen since the Great Recession, plummeting the price of crude oil.[9]



55.     The price war had negative implications for both OPEC member countries and the U.S. oil industry. OPEC member countries are sensitive to major and extended price changes because their economies rely heavily on oil production.[10] Thus, the price war placed significant

---

[9] www.eia.gov

[10] *See* Radmilla Sulemanova, *Can Saudi Arabia really afford to wage an oil price war?* AL JAZEERA Al Jazeera (March 15, 2020), https://www.aljazeera.com/economy/2020/3/15/can-saudi-arabia-really-afford-to-wage-an-oil-price-war; Shaun Walker et al., *Recession, retrenchment, revolution? Impact of low crude prices on oil powers*, THE GUARDIAN (Dec. 30, 2015), https://www.theguardian.com/business/2015/dec/30/oil-iran-saudi-arabia-russia-venezuela-nigeria-

pressure on OPEC member countries. On the other hand, the price war forced the U.S. energy industry to lay off workers and caused institutional investors to pull back.[11]

56.    However, the increased production and competition from OPEC incentivized the U.S. shale oil industry to develop more ways cut costs and increase productivity. The U.S. shale industry created new ways to produce shale oil with lower costs, which allowed them to continue profitably competing with OPEC.[12] These new innovations allowed U.S. shale companies to exploit less productive shale plays profitably and drive down the breakeven point. As such, OPEC's price war failed to destroy the U.S. shale oil industry.

57.    U.S. shale producers were able to remain competitive in the lower-price market by focusing on the most productive shale plays, utilizing new cost-cutting measures, and playing chicken by holding on through a long period of low prices to add supply when prices improved.[13] Thus, many U.S. shale producers – including Defendants – continued to drill at consistent levels despite the price drop.

58.    While many U.S. independents went bankrupt or were forced to merge with larger players during the price war, larger players – including Defendants – were able to survive. The price war consolidated the U.S. shale oil industry by destroying smaller Independents.

**E.    OPEC Changes its Tactics.**

59.    After years of pushing oil prices down with little result, OPEC first changed tactics by making a deal with ten oil producing nations to form OPEC+ in December 2016. This increased

---

libya?source=content_type%3Areact%7Cfirst_level_url%3Aarticle%7Csection%3Amain_content%7Cbutton%3Ab ody_link.

[11] *See* Shaun Walker et al., *Recession, retrenchment, revolution? Impact of low crude prices on oil powers*, THE GUARDIAN (Dec. 30, 2015), https://www.theguardian.com/business/2015/dec/30/oil-iran-saudi-arabia-russia-venezuela-nigeria-libya.

[12] *See* Ernest Scheyder and Ron Bousso, *U.S. shale and OPEC share steak in uneasy truce at Houston dinner*, REUTERS (March 6, 2018), CERAWEEK-U.S. shale and OPEC share steak in uneasy truce at Houston dinner | Reuters.

[13] *See* Steven Mufson, *Is the Oil World Big Enough for Two Swing Producers?*, THE WASH. POST (Sept. 29, 2016), https://www.washingtonpost.com/business/economy/is-the-oil-world-big-enoughfor-two-swing-producers/2016/09/29/ce4e96f0-85f7-11e6-a3ef-f35afb41797f_story.html.

its global market share to almost 60%, brought potential competitors into the fold, and allowed the cartel to share production cuts.

60.     Second, OPEC started a years-long campaign to bring Cowboyistan into the cartel. In November of 2016, OPEC announced an agreement with 11 of its 13 then-active members to reduce oil production by approximately 1.2 million barrels per day for six months, beginning on January 1, 2017, to stabilize declining oil prices.[14] In December of 2016, 11 non-OPEC countries, including Russia, joined the agreement to reduce oil production to 558,000 barrels per day.[15] OPEC hoped to push oil to $60 a barrel.[16] OPEC approached Defendants and their investors to reach an agreement on output, believing that cutting its production and that of OPEC+ countries was not enough to raise oil prices. OPEC wanted U.S producers to minimize free riding and forego some opportunities to produce oil at a profit. These negotiations were complicated because they required coordination of production cuts amongst a significant group of U.S. shale oil producers who were supposed to be in competition with each other. If any big Independents were uncooperative, the benefits of cooperation for OPEC and other U.S. shale oil producers would be undercut.

61.     Despite these challenges, Independents were open to cartelization. For example, on September 8, 2016, it was reported that Defendant Continental's CEO – Shale-oil baron Harold Hamm "thinks major crude-oil producers need to settle on a plan to stabilize oil prices sooner than later."[17] Hamm further called for a freeze of production, stating that "it is 'high time' for Russia and the Organization of the Petroleum Exporting Countries to forge a pact that would put an end to [the] slide in crude oil prices."[18] This was a signal to OPEC that Continental and other Defendants were willing to cooperate with OPEC.

---

[14] "OPEC and Non-OPEC Crude Oil Production Agreement: Compliance Status," at 1 (Nov. 16, 2017).
[15] *Id.*
[16] *See* Laurence Arnold, *Why OPEC's Breakthrough Might Be Short-Lived: QuickTake Q&A*, BLOOMBERG (Dec. 1, 2016), Why OPEC's Breakthrough Might Be Short-Lived: QuickTake Q&A - Bloomberg.

[17] Mark DeCambre, *Harold Hamm Says It Is 'High Time' for an OPEC Pact to Freeze Output*, MARKETWATCH (Sept. 8, 2016), https://www. https://www.marketwatch.com/story/trumpspotential-energy-czar-says-its-high-time-for-an-opec-pact-to-freeze-output-2016-09-08.
[18] *Id.*

62.    In March 2017, OPEC's Secretary General Mohammed Barkindo ("Barkindo") reached out to shale oil producers in the U.S.[19] Shortly after, Secretary Barkindo stated that OPEC and U.S. shale oil producers agreed "that we share responsibility in this market."[20]

63.    OPEC members and Defendants began having dinners and meetings together in early 2017 at oil industry events worldwide. The earliest meetings took place at the 2017 CERAWeek Conference in Houston. At CERAWeek, OPEC's General Secretary Barkindo attended dinners with approximately two dozen U.S. shale executives including executives from Defendant Pioneer Natural Resources, Co., Defendant Hess Corp., Defendant Chesapeake Energy Corp., and Concho Resources Inc.[21] These dinners were significant because this was purportedly the first time OPEC officials had met with U.S. shale producers. These meetings opened a line of communication between Defendants and OPEC for the first time.

64.    Reportedly, OPEC and U.S. shale executives agreed that lower inventories would be beneficial to all the parties and that the market should be better balanced.[22] U.S. shale companies indicated that they were not willing give up on growth and bear the cost of lower inventories while OPEC expressed willingness to allow shale producers into the cartel to bring up prices.[23] Further, OPEC and U.S. shale executives used this opportunity to seek vital information. OPEC officials sought information about production, cost structure, and future projections from U.S. shale producers while shale producers sought information regarding the price of oil over the next few years, supply, and inventory from OPEC.

65.    This exchange of information amounted to cartel negotiations. The exchange of information about inventory, cost, capacity and production was the first step in negotiations on

---

[19] *See* Handan Kazanci and Baris Saglam, *OPEC, US shale producers to continue dialogue*, ANADOLU AGENCY (July 12, 2017), https://www.aa.com.tr/en/americas/opec-us-shale-producers-to-continue-dialogue/859975.
[20] *Id.*
[21] Javier Blas & Grant Smith, *OPEC Head to Meet with U.S. Shale Producers for Dinner Next Week*, BLOOMBERG (Feb. 27, 2018), https://www.bloomberg.com/news/articles/2018-02-27/opec-head-tomeet-u-s-shale-oil-producers-for-dinner-next-week.
[22] Javier Blas, *OPEC Said to Break Bread With Shale in Rare Show of Détente*, BLOOMBERG (Mar. 7, 2017), https://www.bloomberg.com/news/articles/2017-03-07/opec-said-to-break-bread-with-shalein-rare-show-of-detente (emphasis added).
[23] *Id.*

future production levels and setting prices without rising to the level of actual agreements on coordinated production cuts.

66.    According to OPEC Secretary General Barkindo, Defendants started to "ask questions about how to proceed [alongside OPEC] in a more responsible manner" later that same year.[24] Secretary Barkindo called for U.S. shale producers to share responsibility for oil price and indicated that there was an understanding from sideline meetings with executives of Defendant Hess and Continental Resources that the downturn caused by the price war was bad for all parties.[25]

67.    OPEC and U.S shale oil executives continued their dialogue in the following CERAWeek Conference in March 2018. At a dinner held in Houston, Texas, Secretary Barkindo gave a speech to OPEC officials and shale oil executives where he expressed OPEC's views on the oil market and encouraged everyone to work together.[26] The then CEO of Defendant Pioneer and the CEO of Defendant Centennial attended that dinner.[27]

68.    At this dinner, the parties discussed the current cycle, compared notes from previous cycles, exchanged forward looking production expectations and projections.[28] This information was very valuable to attendees because they could use it to coordinate production and stabilize prices.[29] By now, Defendants had gained" a seat at the table on pricing," which is a violation of the Sherman Act because it forbids price fixing with competitors.[30] While OPEC may avoid accountability under U.S. law, U.S companies cannot.

---

[24] Anjli Raval, *OPEC Secretary General: 'No Doubt' Oil Market is Re-Balancing*, FIN. TIMES (Oct. 19, 2017), https://www.ft.com/content/89ddcf13-f338-315a-99ba-366256c7266a.

[25] *Id.*

[26] Ernest Scheyder and Ron Bousso, *CERAWEEK-U.S. Shale and OPEC Share Steak in Uneasy Truce at Houston Dinner*, REUTERS (Mar. 7, 2018), https://www.reuters.com/article/ceraweek-energyopec-shale/rpt-%20ceraweek-u-s-shaleandopec-share-steak-in-uneasy-truce-at-houston-dinneridUKL2N1QP05R.

[27] *Id.*

[28] *OPEC bulletin Special Edition: OPEC international energy dialogues*, OPEC (May 9, 2018), https://www.opec.org/opec_web/static_files_project/media/downloads/publications/OB022019.pdf, at 51 (emphasis added).

[29] *See* Patti Domm, *OPEC Wants to Take Its Relationship with US Shale Producers to the Next Level*, CNBC (Mar. 6, 2018), https://www.cnbc.com/2018/03/06/opec-wants-to-take-its-relationship-withus-shale-producers-to-the-next-level.html (emphasis added); Ernest Sheyder, *Nigeria Prime Minister says majors in shale, OPEC should keep crude price stable*, REUTERS (Mar. 5, 2018), https://www.reuters.com/article/us-ceraweekenergynigeria/nigeriaminister-says-majors-in-shale-opec-should-keep-crude-pricestableidINKBN1GH347.

[30] Alex Lawler & Ernest Scheyder, *OPEC to Meet with U.S. Shale Firms in Houston on Monday: Sources*,

69.    After this dinner, Defendants started to come to heel. Defendant Continental's CEO Harold Ham attended a Saudi Aramco board meeting in May 2018 and asked, "fellow shale producers to focus more on profitability and less on profligate production."[31] U.S. officials also attended the June 2018 OPEC International Seminar in Vienna including two executives from Defendant Pioneer and Defendant Hess. It was unusual for U.S. executives to attend because U.S. antitrust law prevents U.S. producers from working with OPEC members or entering into output agreements.[32] During the seminar, Scott Sheffield, the then CEO of Defendant Pioneer, made several statements including: (1) that "OPEC should boost daily output by roughly 1 million barrels over time"; (2) OPEC needs "to put together some kind of deal to phase into the market. None of us want $80 to $100 oil, that's too high. There's a sweet spot between $60 and $80"; and (3) that "OPEC needs to fulfill its duty."[33]

70.    At this Summit, Defendants admitted to actively participating in meetings with OPEC. More specifically, CEO Sheffield admitted to discussing Defendants' and OPEC's volumes and their effects on global prices with the OPEC panel. CEO Sheffield himself stated that his message to the panel "was that it's important that OPEC increases production somewhat to make up for the difference. If they don't we are going to see $100 oil or higher."[34]

71.    U.S. shale executives and OPEC representatives met with each other for a third CERAWeek conference in March 2019. The event had "become an informal communication channel between the cartel and fast-growing shale producers."[35]

---

REUTERS (Feb. 27, 2018), https://www.reuters.com/article/us-oilopecusa/opec-to-meetwith-u-s-shale-firms-in-houston-on-monday-sources-idUSKCN1GB2KP.

[31] Ernest Scheyder, *Continental Resources CEO Harold Hamm pulls out of OPEC meeting*, REUTERS (June 18, 2018), https://www.reuters.com/article/us-oil-opec-contl-resourcesidUSKBN1JE1VW/.

[32] Ernest Scheyder, U.*S. Shale Executive Pushes OPEC to Gradually Boost Output*, REUTERS (June 20, 2018), https://www.reuters.com/article/oil-opec-pioneer-natl-rscidINKBN1JG2OB.

[33] *Id.*

[34] Bloomberg Daybreak: Americas, *Pioneer Chairman Sees an OPEC Increase of Up to 600,000 B/D*, BLOOMBERG (June 21, 2018), https://www.bloomberg.com/news/videos/2018-06-21/pioneerchairman-sees-an-opec-increase-of-up-to-600-000-b-d-video.

[35] *See* Javier Blas and Kevin Crowley, *OPEC to Break Bread With Shale Competitors for Third Year*, BLOOMBERG (Mar. 11, 2019), https://www.bnnbloomberg.ca/opec-to-break-breadwithshalecompetitors-for-third-year-1.1227226.

**F.      Defendants' Cooperative Relationship with OPEC Takes Shape.**

72.     It is unclear when exactly Defendants' cooperative relationship with OPEC developed to the point that they began coordinating their output with OPEC. However, industry commentators and analysts expected the U.S to continue rapid expansion and that 2019 would be the start of a second wave of the U.S. shale revolution.[36] This revolution would have been detrimental to OPEC's supply control.[37] However, this revolution never came to fruition.

73.     In 2020, COVID-19 threw a wrench into oil industry. A combination of factors drove the price of oil to fall below zero at one point and under $40 per barrel for around four months. This caused OPEC to cut production to stabilize prices. Low oil prices also caused changes



in the U.S. shale industry, causing mergers and bankruptcies that further consolidated market share in industry leaders.

---

[36] Sarah McFarlane & Pat Minczeski, *OPEC vs. Shale: The Battle for Oil Price Supremacy*, THE WALL STREET J. (Apr. 18, 2019), https://www.wsj.com/articles/opec-vs-shale-the-battle-for-oilprice-supremacy-11555588826.
[37] *Id.*

74.    In July 2020, OPEC's Secretary General made the following statement indicating that OPEC would inflate high crude oil prices if Defendants cooperated:

"We were able to reach out to the U.S. independents and we had established a line of communication with them. ***We have reached some level of comfort among ourselves. They have been participating also at their own levels to ensure that this conversation is inclusive and is led by the biggest producers.*** There is no objective whatsoever from us as a group or as individual countries to drive U.S. shale production out of business. ***Everybody has a role to play. We are very much appreciative of the support and the cooperation we are getting from the U.S. both at the level of policymakers as well as from industry.***"[38]

75.    A few months later, EOG Resources' CEO, Bill Thomas, revealed the industry's decision to cooperate with OPEC by not increasing production in response to OPEC's inflation of prices. Mr. Thomas stated: "We don't want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices."[39]

76.    By 2021, as the oil industry was recovering from the fall in oil demand caused by the COVID-19 pandemic, oil prices rose to their highest level in more than two years. This is when the conspiracy ramped up. At this time, OPEC and OPEC+ countries began pushing prices up by withholding production during rising demand. Defendants did their part by suddenly and almost uniformly slowing down their own production. This caused prices to rise "mostly because of the declining responsiveness of the shale sector, rather than official production restraint from OPEC and its allies in the wider OPEC+ exporters group."[40] Even as oil prices trended towards $75 per barrel, Defendants held the line when this situation historically would have triggered a drilling boom.[41]

---

[38] OPEC Secretary General: *No objective to drive US shale out of business*, OIL & GAS J. (July 9, 2020) (emphasis added), https://www.ogj.com/generalinterest/article/14179258/opecsecretarygeneral-no-objective-to-drive-us-shale-out-of-business.

[39] Kevin Crowley, et al., *The Pandemic Has Broken Shale and Left Oil Markets in OPEC Hands*, BLOOMBERG (Nov. 28, 2020) (emphasis added), https://www.bloomberg.com/news/articles/2020-1128/the-pandemic-has-broken-shale-and-left-oil-markets-in-opec-hands?embedded-checkout=true.

[40] *See* John Kemp, "*U.S. shale restraint pushes oil prices to multi-year high,*" REUTERS (June 4, 2021), https://www.reuters.com/business/energy/us-shale-restraint-pushes-oil-prices-multi-year-high-kemp-2021-06-04/.

[41] *See* Liz Hampton, *U.S. shale industry tempers output even as oil price jumps*, REUTERS (June 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-output-even-oil-price-jumps-2021-06-28/.

77.    Defendants' CEOs began making public statements about staying "disciplined" in its production decisions. For example, Pioneer CEO Scott Sheffield stated that U.S. shale oil producers would stay "disciplined regardless whether it's $75 Brent, $80 Brent, or $100 Brent," and indicated that shareholders will punish companies that go back to growth.[42] CEO Sheffield also predicted that while small companies would increase output in response to rising prices, major producers would not, even if crude prices exceeded $60.[43] Defendants continued to signal OPEC and to each other that they were abandoning their role as swing producers throughout 2021.

78.    Defendants' focus on "discipline" in 2021 was a sharp departure from its prior behavior. Especially since withholding production was against their best interest. Industry experts and reporters found this choice puzzling. For example, a Reuters journalist commented that "U.S. shale producers have normally captured market share from OPEC+ whenever prices have been above $55-60 per barrel" and Defendants' restraints "emboldened OPEC+ to maintain its own output curbs, temporarily removing the threat of lost market share and accelerating the upward pressure on prices."[44]

79.    In 2021, the price of oil trended upward, with benchmark U.S. crude futures traded above $73 per barrel, the highest since October 2018. Even so, the number of U.S. rigs drilling trended downward.[45] OPEC seemed unsurprised with Defendants' restraints, predicting a significant drop in U.S. shale production in 2021.[46]

### G.    2022-2023: Defendants' Coordination with OPEC Intensifies.

---

[42] *See* Derek Brower and David Sheppard, *US shale drillers cannot contain oil price rise, Pioneer boss says*, FINANCIAL TIMES (Oct. 3, 2021), https://www.ft.com/content/c21eb656-8d09-45ce-a13a-7d8419426b05.
[43] Alex Lawler & Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale Rebound Even as Crude Prices Rise*, REUTERS (Feb. 23, 2021), https://www.reuters.com/business/energy/opec-us-oilfirms-expect-subdued-shale-rebound-even-crude-prices-rise-2021-02-22/.
[44] John Kemp, *U.S. Shale Restraint Pushes Oil Prices to Multi-Year High*, REUTERS (June 4, 2021), https://www.reuters.com/article/global-oil-kemp-idAFL5N2NM37M.
[45] Ernest Sheyder, *Nigeria Prime Minister says majors in shale, OPEC should keep crude price stable*, REUTERS (Mar. 5, 2018), https://www.reuters.com/article/us-ceraweekenergynigeria/nigeriaminister-says-majors-in-shale-opec-should-keep-crude-pricestableidINKBN1GH347.
[46] Alex Lawler & Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale Rebound Even as Crude Prices Rise*, REUTERS (Feb. 23, 2021), https://www.reuters.com/business/energy/opec-us-oilfirms-expect-subdued-shale-rebound-even-crude-prices-rise-2021-02-22/.

80.    Crude oil prices shot up in 2022 in response to Russia's invasion of Ukraine. By the middle of 2022, the price of oil was more than $120 a barrel. In response, OPEC made production cuts and withheld production to maintain these high prices as crude oil prices began to normalize.[47]

81.    As a result, 2022 experienced record high oil prices which continued into 2023. However, Defendants continued to withhold production against their own rational economic self-interest.[48] For example, in February 2022, CEO Sheffield made comments hinting at the existence of an agreement between Defendant: "In regard to the industry, it's been interesting watching some of the announcements so far, the public independents are staying in line" and "I'm confident they will continue to stay in line."[49] Even more telling was his willingness to ignore the price of oil even though it had nearly doubled. "Whether it's $150 oil, $200 oil, or $100 oil, we're not going to change our growth plans."[50] Other Defendants also signaled that they would fall in line. That same month, Continental CEO William Berry stated, "[w]e project generating flat to 5% annual production growth over the next five years."[51] It was further reported on February 24, 2022, that "EOG Resources Inc. plans to restrain oil growth despite surging prices, falling in line with most other major U.S. independent shale producers ... like Pioneer Natural Resources and Continental resources [, who] are also limiting increases to less than 5% this year."[52]

82.    Defendants maintained their position in 2023 with Pioneer CEO Sheffield stating in January that the "aggressive growth era of US shale is over" and that Pioneer and the other

---

[47] Jeff Stein, et al., *OPEC, Allies Move to Slash Oil Production, Eliciting Blistering White House Response*, WASH. POST (Oct. 5, 2022), https://www.washingtonpost.com/business/2022/10/05/opecplus-oil-cut-russia-saudi-arabia/.

[48] *See* Erik Norland, *As Oil Prices Plunge, What Will Swing Producers Do?*, CME GROUP (Nov. 21, 2018), https://www.cmegroup.com/education/featured-reports/as-oilprices-plunge-what-will-swing-producers-do.html.

[49] Tsvetana Paraskova, *Not Even $200 Oil Will Make Shale Giants Drill Aggressively*, OILPRICE.COM (Feb. 18, 2022), https://oilprice.com/Energy/Energy-General/Not-Even-200-Oil-Will-Make-ShaleGiants-DrillAggressively.html#:~:text=The%20largest%20U.S.%20shale%20producers,shale%20firms%20said %20this%20week.

[50] *Id.*

[51] *Id.*

[52] Kevin Crowley, *EOG Holds Back Oil-Production Growth in Line with Shale Peers*, BLOOMBERG (Feb. 24, 2022), https://www.bloomberg.com/news/articles/2022-02-24/eog-holds-back-oilproduction-growth-in-line-with-shale-peers.

Defendants were no longer swing producers.[53] Defendants and OPEC met again at a restaurant in Houston, Texas in March 2022 where OPEC's Barkindo announced "[w]e have more that binds us together and so we need to work together to exploit that relationship."[54]

83.    Defendants' production restraint and refusal to compete for market share despite high crude oil prices confused oil industry commentators.[55] For example, in February 2022, a Bloomberg article questioned Defendant EOG's plan "to restrain oil growth this year despite surging prices, falling into line with most other U.S. independent shale producers." [56] Bloomberg further reported in April 2023 after further reductions by OPEC that the U.S. shale industry did not plan to increase production in response to rising oil prices - consistent with a three-year trend.[57] One industry expert commented, "OPEC and shale are much more on the same team now, with supply discipline on both sides."[58]

84.    Defendants met with OPEC officials again at the March 2022 CERAWeek Conference in Houston, Texas. During the conference, Defendants presented Secretary Barkindo with a bottle labeled "Genuine Barnett Shale," from the oilfield that started the U.S. shale revolution – a sign that their bitter rivalry was a thing of the past.[59]  Even though oil prices had surged well over $100 a barrel, OPEC and defendants were in no rush to boost production.[60]

---

[53] Derek Brower and Myles McCormick, *What the End of the US Shale Revolution Would Mean for the World*, FIN. TIMES (Jan. 15, 2023), https://www.ft.com/content/60747b3b-e6ea-47c0-938daf515816d0f1.
[54] *See "OPEC meets with U.S. shale executives as oil prices skyrocket*," AL ARABIYA (March 9, 2022), https://english.alarabiya.net/business/energy/2022/03/08/OPEC-meets-with-US-shale-executives-as-oil-prices-skyrocket.

[55] *See* Liam Denning, Shale Companies *Say They Can't Drill More, Even When There's a War?*, BLOOMBERG (Feb. 28, 2022), https://www.bloomberg.com/opinion/articles/2022-02-28/shalecompanies-say-they-can-t-drill-more-even-when-there-s-a-war.
[56] *See* Kevin Crowley, *EOG Holds Back Oil-Production Growth in Line with Shale Peers*, BLOOMBERG (Feb. 24, 2022), https://www.bloomberg.com/news/articles/2022-02-24/eog-holds-back-oilproduction-growth-in-line-with-shale-peers.
[57] Kevin Crowley and Mitchell Ferman, *Don't Expect US Shale to Quickly Fill the Gap Left by OPEC+ Cut*, BLOOMBERG (Apr. 3, 2023), https://www.bloomberg.com/news/articles/2023-0403/opec-surprise-cut-won-t-be-filled-by-us-shale-oil?in_source=embedded-checkout-banner.
[58] *Id.*
[59] Liz Hampton, *As Oil Prices Soar, U.S. Shale, OPEC in no Rush to Resume Price War*, REUTERS (Mar. 10, 2022), https://www. https://www.reuters.com/business/energy/ceraweek-oil-prices-soar-usshale-opec-no-rush-resume-price-war-2022-03-10).
[60] *Id.*

85.    Around a year later in March 2023, around two dozen U.S. shale executives and Defendant executives of Chesapeake Energy, Diamondback energy, Occidental Petroleum, and Hess Corporation met with OPEC Secretary General elect Haitham Al Chais at a private dinner in Houston.[61] At this dinner, the parties reaffirmed their commitment to withholding production and exchanged information on output and forward-looking production estimates.[62]

86.    In the beginning of 2023, Defendants made it even clearer that that they were coordinating with OPEC to set oil prices. In January 2023, Defendant Pioneer's CEO Sheffield predicted that OPEC would make another cut due to a recent price fall.[63] 87 days later, Sheffield's prediction came true, when OPEC declared a surprise production cut, shocking traders around the world.[64]

87.    Before OPEC's shocking production cut, Defendants, including Pioneer and EOG, pulled back on previously held hedge positions established to protect against downward price movements on oil.[65] This left Defendants vulnerable and exposed to significant economic risk if oil prices declined.[66] Even with this significant economic risk, CEO Sheffield was optimistic that prices would be at $100 a barrel before the end of the year, stating "we're not going to hedge."[67] Shortly after, OPEC announced it's shocking decision to cut 1.1 million barrels of oil production per day. Other than having advanced knowledge of OPEC's production cut, there is no other plausible explanation for Defendant's failure to hedge.

---

[61] Stanley Reed, *Mohammad Barkindo, OPEC's top official, dies*, N.Y.TIMES (July 6, 2022), https://www.nytimes.com/2022/07/06/business/opec-barkindo.html.
[62] *Id.*
[63] Kevin Crowley, *One Shale Executive Correctly Called OPEC+'s Surprise Output Cut*, BLOOMBERG (Apr. 4, 2023), https://www.bloomberg.com/news/articles/2023-04-04/one-shaleexecutive-correctly-called-opec-s-surprise-output-cut?sref=NqTCpwwa.
[64] Reuters, *OPEC+ Announces Surprise Cuts in Oil Production*, THE GUARDIAN (Apr. 2, 2023), https://www.theguardian.com/business/2023/apr/02/opec-announces-surprise-cuts-in-oil-productionof-about-115-mbpd.
[65] Justin Jacobs, *Shale Oil Drillers Left Exposed After Pulling Back Price Hedges*, FIN. TIMES (Mar. 28, 2023), https://www.ft.com/content/c3baf69f-41fc-42ea-b13a-5ef6f546e143.
[66] *Id.*
[67] Justin Jacobs, *Shale Oil Drillers Left Exposed After Pulling Back Price Hedges*, FIN. TIMES (Mar. 28, 2023), https://www.ft.com/content/c3baf69f-41fc-42ea-b13a-5ef6f546e143.

88.     Defendants' choice to restrain output despite its ability to increase production and gain market share has resulted in massive revenue increases.

**H.     Factors that Indicate Defendants' Collusion to Restrict the Production of Crude Oil.**

89.     According to the FTC, CEO Sheffield of Pioneer worked to "align U.S. oil production with OPEC and OPEC+ country output agreements, thereby cementing the cartel's position and sharing in the spoils of its market power."[68] The FTC conducted an investigation of CEO Sheffield's private and public communications which prompted it to refer the matter to the U.S. Department of Justice for criminal prosecution.[69] The FTC further opened a civil investigation into whether other executives at major oil companies improperly communicated with OPEC.[70]

90.     Like OPEC and OPEC+, Defendants have a financial incentive to control oil prices at artificially inflated levels by sharing information and controlling output.

91.     Further, Defendants acted against their economic self-interest by choosing not to increase production as crude oil prices rose despite individual incentives to capture market share. In contrast, smaller and less powerful U.S. shale oil producers increased production around 2020 as oil markets surged.

92.     Defendants extensively communicated with OPEC and OPEC+ officials at conferences like CERAWeek in formal and informal meetings where they exchanged important information and projections.

93.     Defendants share common investor ownership which allows Defendants easily communicate and coordinate as a whole with OPEC and each other.

---

[68] *In the Matter of Exxon Mobil Corporation*, 89 Fed. Reg. 42875-02 (May 16, 2024).

[69] *See* Liz Hoffman and Gina Chon, "*FTC plans to recommend a possible criminal case against ex-Pioneer CEO*," Semafor (May 2, 2024).

[70] *See* Mitchell Ferman, Leah Nylen, and Jennifer Dlouhy, "*FTC Eyes Oil Bosses' Texts for Signs of Collusion With OPEC*," BLOOMBERG (July 19, 2024), .

## V.    DEFENDANTS' INFLUENCE ON OIL PRICE CONTROL

94.    The Defendants collectively possessed enough power to significantly impact global oil prices. The chart below illustrates quarterly fluctuations in global oil supply and demand from 2005 to 2023.[71]

95.    Global oil consumption remains relatively stable, with significant demand fluctuations influenced by long-term trends. For instance, despite quarterly variations, the graph above reveals a consistent long-term increase in oil consumption since 2005. This trend is largely driven by growth in developing countries, although it is somewhat moderated by the efforts of developed nations to decarbonize their economies.

96.    Long-term demand trends lead to corresponding long-term trends in supply. Increasing demand over time typically prompts substantial capital investments in large-scale



conventional and unconventional oil projects, often led by major oil companies. These sponsors

---

[71] See https://www.eia.gov/.

commit significant up-front capital based on their long-term demand forecasts, anticipating that the projects will produce oil at low marginal costs for many years. This allows them to sell the oil at a steady profit, ultimately yielding strong returns on their initial investment.

97.    Due to the lengthy planning and development periods required, these large projects have minimal impact on global prices in the medium term. However, they do influence the long-term global supply landscape. Major oil companies typically sell their products at stable and predictable levels to a reliable and steady base of demand.

98.    Over shorter time frames, oil supply and demand can fluctuate significantly, though these variations remain within a narrow range of the overall market. These fluctuations are depicted as smaller peaks and troughs in the chart above, which shows a general upward trend. The most significant demand drops occurred during the COVID-19 pandemic, with unprecedented declines of 7.48 million barrels per day (Mmbd) and 6.89 Mmbd in Q1 and Q2 of 2020, respectively, from a pre-COVID baseline of approximately 102 Mmbd. At the crisis's lowest point, global oil demand fell by nearly 15%. However, demand rebounded by 5.63 Mmbd in the subsequent quarter. Excluding the COVID crisis, the most notable demand shift in the past 18 years was a decrease of 1.95 Mmbd in Q2 of 2005. On average, including pandemic-induced volatility, global oil demand varied by just over 1 Mmbd per quarter, which represents an average fluctuation of about 1.2% throughout the period.

99.    Global crude oil production also fluctuates within a similarly narrow range. The most significant quarterly increase in production occurred in Q2 2020, rising by 8.38 Mmbd. On average, supply changes from quarter to quarter amounted to just 0.82 Mmbd.

100.    Relatively small fluctuations in supply and demand, along with financial market expectations, influence short- and medium-term changes in global oil prices. For instance, in the latter half of 2014, at the start of OPEC's price war with U.S. Independents, global oil supply rose by just 3.03 Mmbd compared to Q2 levels, while global demand increased by 1.53 Mmbd. This 1.5 Mmbd shift in the supply-demand balance—about 2% of total production—caused crude oil prices to plummet from $105.79 per barrel in June 2014 to $59.29 in December. Accordingly, a

2% shift in oil supply resulted in a 47% decrease in price.

101.    Starting in 2022, the Defendants collectively produced over 1 Mmbd of crude oil at deliberately constrained levels, as part of a conspiracy. While this represents a small portion of the global oil supply, it is nimble output at the margin, crucial to the balance of supply and demand. They also control additional potential production that could be ramped up within months. Consequently, the Defendants' share of short-run productive capacity—the capacity most influential in short-term oil price fluctuations—is significantly larger, especially when excluding the capacity controlled by the OPEC+ cartel. By collectively withholding production (and coordinating with OPEC+), the Defendants wield considerable market power, sufficient to significantly impact global crude oil prices.

102.    By combining the Defendants' production and capacity with OPEC and OPEC+, the resulting cartel controls approximately 60% of global oil production. In fact, they directed nearly all the oil supply that can be quickly brought to market in response to short-term price fluctuations.

## VI.    ADDITIONAL INDICATORS OF COLLUSION

103.    The statements from OPEC and the Defendants quoted above clearly demonstrate explicit coordination of production cuts between the Defendants and OPEC. Furthermore, the Defendants' parallel actions in collectively limiting shale oil production are strongly supported by additional factors, reinforcing a plausible and reasonable inference of collusion over any potential non-collusive explanations.

104.    It is well-established that the oil industry enables a powerful cartel that effectively controls global prices, as it is exceptionally prone to collusion on production levels. As a quintessential commodity with interchangeable products, it fosters an environment conducive to price-fixing negotiations among potential competitors.

105.    The Defendants have had numerous opportunities for collusion. As previously detailed, they have indeed met with OPEC at trade association events, including the annual CERAWeek Conference in Houston, TX, to discuss their internal coordination and their collective efforts with OPEC to manage surplus capacity. Public reports from participants—who have reasons to understate their collusion—confirm that these meetings were explicitly aimed at fostering cooperation between the Defendants and OPEC.

106.    The segment of the oil market that affects prices—the short-term productive capacity to swiftly adjust supply in response to price signals—is highly concentrated, with most of it controlled by the cartelized OPEC and OPEC+. Beyond this cartel, the Defendants manage a substantial share of the remaining productive capacity. Overall, while the global oil market is somewhat diverse, over 60% of it is directly controlled by cartels.

107.    Crude oil sold in the U.S. is vulnerable to the price effects of collusion because it is a daily-use commodity with few substitutes for many consumers and high switching costs for others, resulting in highly inelastic demand. This inelasticity extends to the downstream products that rely on crude oil as a key input. The market conditions for crude oil sold in the U.S. are susceptible to the price effects of collusion because it, and the downstream products for which it is the key input, is a daily-use commodity that has no substitute for many purchasers and high switching costs for the remainder, leading to highly rigid demand.[72]   Rigid demand enables producer cartels to extract monopoly rents from customers who have limited options to avoid price hikes.

108.    The Defendants had strong individual incentives to boost their production during the class period. Their choices not to increase production make economic sense only within the framework of mutual agreements to limit production. As demonstrated above, the Defendants engaged in extensive interfirm communications, both privately and through publicly reported

---

[72] The gasoline market has rigid demand, meaning that few consumers will switch to alternative products even if pump prices increase. This further amplifies the rigidity of upstream demand for crude oil.

statements regarding competitively sensitive information like forward-looking production plans.

## VII.    INJURY RELATED TO ANTITRUST

### A. The Defendants' Agreement to Limit Shale Oil Production Has Inflated and Affected the Price of Crude Oil Throughout the Class Period.

109.    The Defendants' control over a significant portion of short-term productive capacity gives them considerable influence over crude oil prices. Many economists have linked changes in oil prices to U.S. oil shale production.[73]

110.    The Defendants acknowledge their influence but have chosen not to exercise it.[74] Since at least 2021, the Defendants have collectively coordinated their production decisions, leading to production growth rates that are lower than what would be expected in a competitive market, despite high oil prices and strong global demand. Notwithstanding increases in production from supermajors and smaller private producers, the Defendants' production restraint has significantly affected total U.S. shale production. In 2022, U.S. shale oil production rose by only 500,000 barrels, falling 50% short of market analysts' general yearly forecasts.[75]

---

[73] Robert Rapier, *The U.S. Accounted for 98% of Global Oil Production Growth in 2018*, FORBES (June 23, 2019), https://www.forbes.com/sites/rrapier/2019/06/23/the-u-s-accounted-for-98-of-global-oil-production-growth-in-2018/?sh=297892b51251; Irma Alonso Alvarez & Virginia Di Nino, *The oil market in the age of shale oil*, 8 ECB Econ. Bulletin, 57-74 (2017); *The Value of U.S. Energy Innovation & Policies Supporting the Shale Revolution*, Council of Econ. Advisors (Oct. 2019), https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/10/The-Value-of-U.S.-Energy-Innovation-and-Policies-Supporting-the-Shale-Revolution.pdf; Nathan S. Balke, et al., *The Shale Revolution and the Dynamics of the Oil Market*, Fed. Reserve Bank of Dallas (June 17, 2020), https://www.dallasfed.org/research/papers/2020/wp2021; and, Maitham A. Rodhan, *The Effect of US Shale Oi Production on Local and International Oil Markets*, 13 INT'L J. OF ENERGY ECONS. & POLICY 4 at 433-34 (July 2023), https://econjournals.com/index.php/ijeep/article/view/14455.

[74] Stanley Reed, *As Oil Soars, OPEC and Its Allies Decline to Offer Relief*, N.Y. TIMES (Mar. 2, 2022), https://www.nytimes.com/2022/03/02/business/oil-prices-opec.html ("[e]xecutives of several companies, including [Defendant] Pioneer Natural Resources . . . and [Defendant] Continental Resources, have said in recent days that they were committed to limiting production to avoid oversupplying the market and pushing down prices...")

[75] Eric Rosenbaum, *Oil CEOs Are Doubling Down on Buybacks as Biden Budget Seeks to*

111.    **This outcome created a substantial disparity between the oil supply that reached the market and the supply that would have been available without the Defendants' conspiracy. This gap caused crude oil prices to rise above what would have occurred in a competitive market, inevitably leading to higher prices at the pump for class members and others.**

### B. The Defendants' Agreement to Limit Shale Oil Production Has Driven Up the Prices of Gasoline and Diesel Fuel Purchased by the Plaintiffs and the Classes.

112.    In the U.S., commercial buyers of gasoline and diesel fuel, such as the Plaintiffs and proposed class members, obtain these fuels from gas stations and truck stops. About 54-57% of the U.S. price of gasoline is attributed to the cost of crude oil used in its production, with additional costs including refining, taxes, and distribution and marketing.[76] For diesel fuel, crude oil accounts for roughly 45% of the pump price.

---

*Quadruple Tax*, CNBC (Mar. 7, 2023), https://www.cnbc.com/2023/03/07/oxy-ceo-doesnt-seem-worried-about-politics-of-buybacks-gas-prices.html.

[76] The rest of the gasoline price is driven by distribution and marketing costs (16%), refining costs (14%), and taxes (16%). *The Four Main Factors that Influence U.S. Gas Prices*, U.S. DEP'T OF ENERGY (Last Visited Sept. 6, 2024), https://www.energy.gov/sites/default/files/2023-04/GasPriceFactors2.jpg.





113.    Refining, taxes, and distribution and marketing costs generally remain stable, while the price of crude oil is actively traded in financial markets and fluctuates frequently, often

experiencing significant swings. For instance, between March and August 2022, the WTI spot crude oil price varied from below $50 per barrel to over $120. On March 9, 2022, alone, the oil price fell nearly $15 per barrel, a drop of over 11%. As noted by the U.S. Energy Information Administration, "[r]etail gasoline prices are mainly affected by crude oil prices...."[77], which is also applicable to diesel fuel.

114.    The American Petroleum Institute, Defendants' own trade association, has acknowledged that "the price of crude oil is the primary determinant of the price we pay at the pump" and that "[n]ationwide on a quarterly basis, crude oil prices have explained more than 90% of the variation in [U.S.] gasoline prices since 2020."[78]

115.    Given the flow of crude oil through the supply chain, it's no surprise that it significantly impacts gasoline and diesel prices. Defendants and other oil producers sell crude oil to refineries, which process it into gasoline, diesel, and other products. Refined fuels are then sent to bulk storage facilities. Since crude oil is the main ingredient for refining gasoline and diesel, the Defendants' conspiracy directly affected the Plaintiffs and class members, forcing them to pay inflated prices. Gas stations and truck stops buy fuel at wholesale prices tied to the cost of crude oil, including the prices set by Defendants. They then mark up these prices, passing the increase on to consumers.

---

[77] U.S. Energy Information Administration (EIA), Gasoline Explained: Factors Affecting Gasoline Prices (Feb. 22, 2023), https://www.eia.gov/energyexplained/gasoline/factors-affecting-gasoline-prices.php.

[78] *Gas Prices Explained: Five Fast Facts About U.S. Gasoline Price*s, AM. PETROLEUM INST., https://www.api.org/oil-and-natural-gas/energy-primers/gas-prices-explained#:~:text=The%20primary%20factors%20impacting%20gasoline. (Last visited Sept. 6, 2024).  *See also* Factors that impact gas prices, NACS  (Apr.  05, 2023) https://www.convenience.org/Topics/Fuels/The-Price-Per-Gallon("Retail gasoline prices move an estimated 2.4 cents per gallon for every $1 change in the price per barrel [of crude oil].").



The National Association of Convenience Stores reports that gas stations typically add about 35 cents per gallon to the wholesale price. The accompanying figure below illustrates how U.S. gas prices align with the prices paid by refineries for crude oil.

**Refiners Crude Oil Acquisition Costs vs U.S. Average Gasoline Prices (Adjusted for Inflation)**



116.    Therefore, crude oil prices directly affect retail and wholesale gasoline prices.[79] Since crude oil is the main raw material for refining gasoline and diesel in the U.S., fluctuations in crude oil prices lead to changes in gasoline and diesel prices paid by the Plaintiffs and class members throughout the relevant period. Consequently, the Defendants' conspiracy directly impacted these individuals, forcing them to buy gasoline and diesel at artificially inflated prices. Both end consumers and commercial buyers, who are class members, endure the effects of these inflated prices. The impact is significant: nearly all analysts agree that shock oil prices are almost fully passed through to spot gasoline prices. On average, 60% of changes in bulk spot prices are reflected in retail prices within two weeks, 80% within four weeks, and 100% within seven weeks.[80] Diesel exhibits similarly high pass-through rates.

117.    Moreover, while retail gasoline and diesel prices quickly adjust to price increases, they generally decrease more slowly when oil prices fall.[81] This lopsided effect, known as "rockets and feathers," and/or "asymmetric pass-through", highlights the immediate and lasting impact of the Defendants' artificially inflated prices on commercial purchasers in this Class.

118.    In addition to purchasing gasoline and diesel at retail prices, Plaintiffs also purchased light petroleum products in "rack sales." Rack sales" are wholesale sales where title transfers at the terminal.[82] Plaintiffs purchased rack rates with a variable, depending on the size of

---

[79] In his 2023 State of the Union, President Biden said that U.S. gasoline prices were too high because oil producers invested "too little" of their "record profits" to ramp up domestic production and "used those record profits to buy back their own stock, rewarding their CEOs." *See* Ian Thomas, *U.S. won't reach a new record in oil production 'ever again,' says Pioneer Natural Resources CEO,* CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html FTC Bureau of Economics, *Gasoline Price Changes and the Petroleum Industry: An Update*, at 38 (2011). In the U.S., regions with the fastest speeds, such as the Gulf Coast and Midwest, see full pass-through of price changes within four to six weeks.
[81] Matthew Chesnes, *Asymmetric Pass-Through in U.S. Gasoline Prices*, Bureau of Economics Federal Trade Commission Working Paper No. 302 (June 18, 2010) ("This paper presents new evidence of asymmetric pass-through, the notion that upward cost shocks are passed through faster than downward cost shocks, in U.S. gasoline prices."), https://www.ftc.gov/sites/default/files/documents/reports/asymmetric-pass-through-u.s.gasoline-prices/wp302_0.pdf.
[82] *See* U.S. Energy Information Administration, "Glossary" (defining "rack sales").

the fuel deliveries. Rack purchases are typically made from wholesalers along the fuel distribution system. These purchases are usually governed by contracts that include a benchmark price, fees, taxes, and transportation costs. Plaintiffs purchased light petroleum products in rack sales from wholesale suppliers. The prices paid by Plaintiffs in these rack sales were directly impacted by the increased price of crude oil because an increase in crude oil prices increases the price of light petroleum products.

## VIII.    CLASS ACTION ALLEGATIONS

119.    Plaintiffs bring this action on behalf of themselves and under Federal Rule of Civil Procedure 23(a), (b)(1), and (b)(2) as a representative of a class of indirect purchasers seeking injunctive relief (the "Nationwide Injunctive Relief Class") defined as:

> All non-federal and non-state governmental entities who purchased retail gasoline or retail diesel fuel for commercial use from a gas station or truck stop in the United States and/or purchased light petroleum products including gasoline, distillate fuel, and jet fuel in a rack sale in the United States and not for resale, between January 1, 2021 and until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

120.    Plaintiffs also bring this action on behalf of themselves and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following class (the "State Law Class"):

> All non-federal and non-state governmental entities who purchased retail gasoline or retail diesel fuel for commercial use from a gas station or truck stop and/or purchased light petroleum products including gasoline, distillate fuel, and jet fuel in a rack sale and not for resale, in Alabama, Arizona, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, and/or Vermont between January 1, 2021 and until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

121.    For the purposes of these Class definitions, "purchased … for commercial use" includes all purchases made solely for business purposes, the cost of which was not fully reimbursed to the class member.

122.    Specifically excluded from these Classes are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant. Also excluded from both Classes are the federal governmental and its entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, any business majority-owned by any such person, and any co-conspirator identified in this action.

123.    Both Classes are so numerous as to make joinder impracticable. Plaintiffs do not know the exact number of Class members but the above-defined classes are readily identifiable and are ones for which records should exist. Plaintiffs believe that due to the nature of the product market there are at least hundreds of thousands of members of both Classes in the United States.

124.    Common questions of law and fact exist as to all members of both Classes. Plaintiffs and both Classes were injured by the same unlawful price-fixing conspiracy, and Defendants' anticompetitive conduct was generally applicable to all the members of the Classes, and relief to both Classes as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

a. whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize the price of crude oil and/or gasoline and diesel fuel in the United States;

b. the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

c. whether such combination or conspiracy violated the antitrust and consumer protection laws of various states;

d. whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the Plaintiffs and other members of the Classes;

e. whether Defendants caused Plaintiffs and the Class to suffer damages in the form of overcharges on gasoline and diesel fuel;

f. the effect of Defendants' alleged conspiracy on the prices of retail and rack rate gasoline and diesel fuel sold in the United States during the Class Period;

g. the appropriate Class-wide measure of damages; and

h. the nature of appropriate injunctive relief to restore competition in the U.S. market for gasoline and diesel fuel.

125.    Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of both Classes. Plaintiffs and all members of both Classes are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for gasoline and/or diesel fuel sold in the U.S., resulting from price-fixing in the crude oil market by cartel members.

126.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Classes.

127.    Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

128.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including issues relating to liability and damages.

129.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual

members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

130.    Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## IX.    CLAIMS FOR RELIEF

### VIOLATION OF THE SHERMAN ACT

### COUNT 1

### VIOLATION OF 15 U.S.C. § 1

### (On Behalf of the Nationwide Injunctive Relief Class)

131.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

132.    From at least January 1, 2021, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price for crude oil and gasoline and diesel fuel in the United States, including by restraining their respective production volumes, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

133.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the fixing, raising, and stabilizing of the price of crude oil, gasoline, and diesel fuel.

134.    The combination and conspiracy alleged herein has had the following effects, among others:

a. Price competition in the sale of crude oil has been restrained, suppressed, and/or eliminated in the United States;

b. Prices for crude oil sold by defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

c. Those who purchased gasoline or diesel fuel indirectly from defendants and their coconspirators for their commercial use have been deprived of the benefits of free and open competition, and paid artificially high prices for gasoline and/or diesel fuel.

135. Plaintiffs and members of the Classes have been injured and will continue to be injured in their businesses and property by paying more for gasoline and/or diesel fuel purchased indirectly from the defendants and their co-conspirators for their commercial use than they would have paid and will pay in the absence of the combination and conspiracy.

136. Plaintiffs and members of the classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## VIOLATION OF STATE ANTITRUST, UNFAIR COMPETITION, AND CONSUMER PROTECTION LAWS

137. Plaintiffs repeat and reallege, as if fully set forth herein, each allegation, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

138. Throughout the Class Period, the Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, decrease, stabilize, or maintain at artificially low levels, the production of shale oil in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

139. In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, decrease, maintain, or stabilize shale oil production at artificially low levels, thereby raising, fixing, and stabilizing crude oil prices, which injured Plaintiffs and members of the Classes;

exchange of competitively sensitive information between and among Defendants; and participating in meetings conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

140.   Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize crude oil prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Classes were deprived of free and open competition and paid more to purchase gasoline and/or diesel fuel than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

141.   In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and members of the Classes.

142.   Accordingly, Plaintiffs and the members of the State Law Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

143.   Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust and consumer protection statutes.

144.   In the Counts that follow, a reference to the "Class" is a reference to the State Law Class unless otherwise specified.

## COUNT 2: ALABAMA

### (Class Members that Purchased Gasoline or Diesel Fuel in Alabama)

145.   Because of the Defendants' unlawful conduct, (1) competition for crude oil, gasoline, and diesel fuel was restricted, suppressed, and eliminated within Alabama; (2) gasoline

and diesel fuel prices in the State of Alabama were elevated, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been denied access to free and open competition. The Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of Ala. Code §6-5-60 *et seq.* The Defendants' conspiracy substantially affected Alabama commerce and accordingly, the Plaintiffs and the members of the Class seek all forms of relief available under Ala. Code §6-5-60 *et seq.*

### COUNTS 3 & 4: ARIZONA

### (Class Members that Purchased Gasoline or Diesel Fuel in Arizona)

146.    The Defendants' conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout Arizona; (2) prices of gasoline and diesel fuel in the State of Arizona were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Throughout the Class Period, the Defendants' illegal conduct substantially affected Arizona commerce.

147.    The Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of Ariz. Rev. Stat.. §44-1401 *et seq.* Thus, the Plaintiffs and members of the Class seek all forms of relief available under Ariz. Rev. Stat. §44-1401 *et seq.*

148.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. Ann. §44-1521 *et seq.,* and, accordingly, the Plaintiffs and members of the Class seek all relief available under that statute.

### COUNTS 5 & 6: CALIFORNIA

### (Class Members that Purchased Gasoline or Diesel Fuel in California)

149.    The Defendants' conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout California; (2) gasoline and diesel fuel prices in the State of California were raised, fixed,

maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

150.    Through the Class Period, the Defendants' illegal conduct substantially affected California commerce and consumers.

151.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code §16700 *et seq.* Throughout the Class Period, the Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce.

152.    Each Defendant has acted in violation of Cal. Bus. & Prof. Code §16720 to fix, reduce, stabilize, and maintain crude oil production. The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, reduce, maintain, and stabilize the production of domestic shale oil. For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the prices of gasoline and diesel fuel. As a result of the Defendants' violation of Cal. Bus. & Prof. Code §16720, the Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code §16750(a).

153.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq.,* and, accordingly, the Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 7 & 8: COLORADO

### (Class Members that Purchased Gasoline or Diesel Fuel in Colorado)

154.    The Defendants' conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout

Colorado; (2) gasoline and diesel fuel prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Throughout the Class Period, the Defendants' illegal conduct substantially affected Colorado commerce and consumers. The Defendants have violated Colo. Rev. Stat. §6-4-101 *et seq.* Accordingly, the Plaintiffs and members of the Class seek all forms of relief available under violated Colo. Rev. Stat. §6-4- 101, *et seq.*

155.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. §6-1-101 *et seq.* and, therefore, the Plaintiffs and members of the Class seek all relief available under that statute.

### COUNT 9: CONNECTICUT

### (Class Members that Purchased Gasoline or Diesel Fuel in Connecticut)

156.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq.* The Defendants' combinations or conspiracies had the following effects:

(1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout Connecticut, and (2) gasoline prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition. Throughout the Class Period, the Defendants' illegal conduct substantially affected Connecticut commerce. For the foregoing reasons, the Defendants have engaged in agreements that restrain trade, in violation of Conn. Gen. Stat. §35-24 *et seq.* Therefore, the Plaintiffs and members of the Class seek all forms of relief available under Conn. Gen. Stat. §35-24 *et seq.*

### COUNTS 10 & 11: DISTRICT OF COLUMBIA

### (Class Members that Purchased Gasoline or Diesel Fuel in District of Columbia)

157.    The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the District of Columbia; (2) gasoline and diesel fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) the Plaintiffs and members of the Class, including those who resided in the District of Columbia and purchased gasoline or diesel fuel in the District of Columbia, paid supra-competitive, artificially inflated prices for gasoline and/or diesel fuel. Throughout the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

158.    The Defendants have entered into agreements in restraint of trade in violation of D.C. Code §28-4501 *et seq.* Therefore, the Plaintiffs and members of the Class seek all forms of relief available under D.C. Code, §28-4501 *et seq.*

159.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code, §28-3901 *et seq.,* and, therefore, the Plaintiffs and members of the Class seek all relief available under that statute.

### COUNTS 12 & 13: FLORIDA

### (Class Members that Purchased Gasoline or Diesel Fuel in Florida)

160.    Due to their actions and actions of co-conspirators, crude oil, gasoline, and diesel fuel prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring the Plaintiffs and the Class. Throughout the Class Period, competition in the gasoline and diesel fuel market was restrained, suppressed, and eliminated throughout Florida.

161.    The Plaintiffs and members of the Class, including those who purchased gasoline or diesel fuel in the State of Florida, paid supra-competitive, artificially inflated prices for gasoline and/or diesel fuel.

162.    Throughout the Class Period, the Defendants' illegal conduct substantially affected commerce in Florida. The Defendants have violated the Fla. Stat. §542.15 *et seq.,* through their anticompetitive actions. Therefore, the Plaintiffs and members of the Class seek all forms of relief available under Fla. Stat. §542.15 *et seq.*

163.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practice in violation of Fla. Stat. §501.201 *et seq.,* and, therefore, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 14: HAWAII

### (Class Members that Purchased Gasoline or Diesel Fuel in Hawaii)

164.    The Defendants have violated Haw. Rev. Stat. Ann. §480-1 *et seq*., through their actions. *See* Haw. Rev. Stat. §§480-4, 480-13. Through the Defendants' actions and the actions of their co-conspirators, gasoline and diesel fuel prices in the State of Hawaii were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring the Plaintiffs and the Class.

165.    Throughout the Class Period, price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Hawaii. The Plaintiffs and members of the Class, including those who resided in the State of Hawaii and purchased gasoline or diesel fuel in Hawaii, paid supra-competitive, artificially inflated prices for their gasoline and/or diesel fuel. During the Class Period, the Defendants' illegal conduct substantially affected commerce in Hawaii.

166.    Thus, the Plaintiffs and members of the Class seek all forms of relief available under Haw. Rev. Stat. Ann. §480-1 *et seq*.

## COUNTS 15 & 16: ILLINOIS

### (Class Members that Purchased Gasoline or Diesel Fuel in Illinois)

167.    The Defendants' combinations or conspiracies had the following effects: (1) price competition in the crude oil, gasoline, and diesel fuel market was restrained, suppressed, and eliminated throughout the State of Illinois, and (2) gasoline and diesel fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Illinois. Throughout the Class Period, the Defendants' illegal conduct substantially affected Illinois commerce.

168.    The Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1 *et seq.* Thus, the Plaintiffs and members of the Class seek all forms of relief available under 740 Ill. Comp. Stat. 10/1 *et seq.*

169.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1 *et seq,* and 720 Ill. Comp. Stat. 295/1a, and, therefore, the Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 17: IOWA

### (Class Members that Purchased Gasoline or Diesel Fuel in Iowa)

170.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §553.1 *et seq.* The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) gasoline and diesel fuel prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. Throughout the Class Period, the Defendants' illegal conduct substantially affected Iowa commerce. For the foregoing reasons, the Defendants have entered into agreements in restraint of trade in violation of Iowa Code §553.1 *et seq.* Thus, the Plaintiffs and members of the Class seek all forms of relief available under Iowa Code §553.1 *et seq.*

## COUNT 18: KANSAS

### (Class Members that Purchased Gasoline or Diesel Fuel in Kansas)

171.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of KAN. STAT. ANN. §50-101 *et seq.* The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Kansas; (2) gasoline and diesel fuel prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Throughout the Class Period, the Defendants' illegal conduct substantially affected Kansas commerce. Thus, the

Plaintiffs and members of the Class seek all forms of relief available under KAN. STAT. ANN. §50-101 *et seq.*

## COUNT 19: MAINE

### (Class Members that Purchased Gasoline or Diesel Fuel in Maine)

172.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Stat. Tit. 10, §1101. The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Maine; and (2) gasoline and diesel fuel prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. Throughout the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Thus, the Plaintiffs and members of the Class seek all relief available under Me. Stat. Tit. 10, §1104.

## COUNTS 20 & 21: MARYLAND

### (Class Members that Purchased Gasoline or Diesel Fuel in Maryland)

173.     The Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Maryland for crude oil, gasoline, and diesel fuel by restraining, suppressing, and eliminating competition. Moreover, the Defendants' unlawful conduct raised, fixed, maintained, and stabilized gasoline and diesel fuel prices in the State of Maryland at artificially high levels. Throughout the Class Period, the Defendants' illegal conduct substantially affected Maryland commerce.

174.     The Defendants violated the Md. Code, Com. Law §11-201 *et seq.,* by entering into unlawful agreement in restraint of trade in the State of Maryland. Thus, Plaintiffs and members of the Class seek all relief available under Md. Code., Com. Law §11-201 *et seq.*

175.     The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Code, Com. Law §13-101 *et seq.,* and, therefore, the Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 22 & 23: MICHIGAN

### (Class Members that Purchased Gasoline or Diesel Fuel in Michigan)

176.    The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Michigan, and (2) gasoline and diesel fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Michigan. Throughout the Class Period, the Defendants' illegal conduct substantially affected Michigan commerce. The Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws §445.771 *et seq.* Thus, Plaintiffs and members of the Class seek all relief available under Mich. Comp. Laws §445.771 *et seq.*

177.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws §445.903 *et seq.,* and, therefore, the Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 24 & 25: MINNESOTA

### (Class Members that Purchased Gasoline or Diesel Fuel in Minnesota)

178.    Due to their actions and actions of co-conspirators, gasoline and diesel fuel prices in the State of Minnesota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring Plaintiffs and the Class. During the Class Period, price competition in the market for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Minnesota. The Plaintiffs and members of the Class, including those who resided in the State of Minnesota and purchased gasoline or diesel fuel there, paid supra-competitive, artificially inflated prices for gasoline and/or diesel fuel. Throughout the Class Period, the Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

179.    The Defendants have violated the Minn. Stat. §325D.49 *et seq.,* through their anticompetitive actions. Thus, Plaintiffs and members of the Class seek all forms of relief available under Minn. Stat. §325D.49 *et seq.*

180.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation Minn. Stat. Minn. Stat. §325d.43-48 *et seq.,* and, therefore, the Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 26: MISSISSIPPI

**(Class Members that Purchased Gasoline or Diesel Fuel in Mississippi)**

181.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code §75-21-1 *et seq. See* Miss. Code §75-57-63. The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Mississippi, and (2) gasoline and diesel fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Mississippi. Throughout the Class Period, the Defendants' illegal conduct substantially affected the State of Mississippi commerce. Thus, Plaintiffs and members of the Class seek all relief available under Miss. Code §75-21-1 *et seq.,* and Miss. Cod§75-57-63.

## COUNTS 27 & 28: NEBRASKA

**(Class Members that Purchased Gasoline or Diesel Fuel in Nebraska)**

182.    The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Nebraska, and (2) gasoline and diesel fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Nebraska. Throughout the Class Period, the Defendants' illegal conduct substantially affected the State of Nebraska commerce.

183.    The Defendants restrained trade and commerce in the State of Nebraska by entering into an unlawful agreement in violation of Neb. Rev. Stat. §59-801 *et seq*. Thus, the Plaintiffs and members of the Class seek all relief available under Neb. Rev. Stat. §59-801 *et seq*.

184.     The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §59-1601 *et seq.,* and, therefore, the Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 29 & 30: NEVADA

### (Class Members that Purchased Gasoline or Diesel Fuel in Nevada)

185.     The Defendants' conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Nevada; (2) gasoline and diesel fuel prices in the State of Nevada were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

186.     The Defendants violated the Nev. Rev. Stat. Ann. §598A.210 *et seq.,* by entering into unlawful agreement in restraint of trade in the State of Nevada. Due to the Defendants' violation of Nev. Rev. Stat. Ann. §598A.210 *et seq*., the Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Nev. Rev. Stat. Ann. §598A.210.

187.     The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §598.0903 *et seq.,* and, therefore, the Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 31 & 32: NEW HAMPSHIRE

### (Class Members that Purchased Gasoline or Diesel Fuel in New Hampshire)

188.     The Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Hampshire crude oil, gasoline, and diesel fuel market by restraining, suppressing, and eliminating competition. Additionally, the Defendants' unlawful conduct raised, fixed, maintained, and stabilized gasoline and diesel fuel prices in the State of New Hampshire at artificially high levels. Throughout the Class Period, the Defendants' illegal conduct substantially affected the State of New Hampshire commerce.

189.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. Rev. Stat. §356:1 *et seq.* Thus, the Plaintiffs and members of the Class seek all relief available under N.H. Rev. Stat. §356:1 *et seq.*

190.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. §358-A:1 *et seq.,* and, therefore, the Plaintiffs and members of the Class seek all relief available under that statute.

### COUNTS 33 & 34: NEW MEXICO

### (Class Members that Purchased Gasoline or Diesel Fuel in New Mexico)

191.    The Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Mexico for crude oil, gasoline, and diesel fuel by restraining, suppressing, and eliminating competition. Additionally, the Defendants' unlawful conduct raised, fixed, maintained and stabilized gasoline and diesel fuel prices in the State of New Mexico at artificially high levels. Throughout the Class Period, the Defendants' illegal conduct substantially affected commerce in the State of New Mexico.

192.    The Defendants violated the N.M. Stat. §57-1-1 *et seq.,* by entering into unlawful agreement in restraint of trade in the State of New Mexico. Thus, the Plaintiffs and members of the Class seek all relief available under N.M. Stat. §57-1-1 *et seq.*

193.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §57-12-1 *et seq.,* and, therefore, the Plaintiffs and members of the Class seek all relief available under that statute.

### COUNT 35: NEW YORK

### (Class Members that Purchased Gasoline or Diesel Fuel in New York)

194.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. Gen. Bus. Law §340 *et seq.* The Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for crude oil, gasoline, and diesel fuel

was restrained, suppressed, and eliminated throughout the State of New York, and (2) gasoline and diesel fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of New York. During the Class Period, Defendants' illegal conduct substantially affected the State of New York commerce. The action set forth above is a per se violation of the Donnelly Act, N.Y. Gen. Bus. Las §340 *et seq.* Therefore, the Plaintiffs and members of the Class seek all relief available under N.Y. Gen. Bus. Law §340 *et seq.*

## COUNT 36: NORTH CAROLINA

### (Class Members that Purchased Gasoline or Diesel Fuel in North Carolina)

195.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. Gen. Stat. §75-1 *et seq.* The Defendants' combinations or conspiracies had the following effects:

(1) price competition in the market for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of North Carolina, and (2) gasoline and diesel fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of North Carolina. During the Class Period, the Defendants' illegal conduct substantially affected the State of North Carolina commerce. Therefore, the Plaintiffs and members of the Class seek all relief available under N.C. Gen. Stat. §75-1 *et seq.*

## COUNT 37: NORTH DAKOTA

### (Class Members that Purchased Gasoline or Diesel Fuel in North Dakota)

196.     The Defendants' actions have violated the N.D. Cent. Code §51-08.1-01 *et seq.* through their anticompetitive actions. Through their actions and actions of co-conspirators, gasoline and diesel fuel prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. During the Class Period, price competition in the market for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of North Dakota. The Plaintiffs and members of

the Class, including those who resided in the State of North Dakota and purchased gasoline or diesel fuel there, paid supra-competitive, artificially inflated prices. Throughout the Class Period, the Defendants' illegal conduct substantially affected commerce in the State of North Dakota. Therefore, the Plaintiffs and members of the Class seek all forms of relief available under N.D. Cent. Code §51-08.1-01 *et seq.*

## COUNTS 38 & 39: OREGON

### (Class Members that Purchased Gasoline or Diesel Fuel in Oregon)

197.    The Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Oregon; (2) gasoline and diesel fuel prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Throughout the Class Period, the Defendants' illegal conduct substantially affected the State of Oregon commerce.

198.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. §646.725 *et seq.* Therefore, the Plaintiffs and members of the Class seek all forms of relief available under OR. Rev Stat. §646.725 *et seq.*

199.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. §646.605 *et seq.,* and, therefore, the Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 40 & 41: RHODE ISLAND

### (Class Members that Purchased Gasoline or Diesel Fuel in Rhode Island)

200.    The Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Rhode Island for crude oil, gasoline, and diesel fuel market by restraining, suppressing, and eliminating competition. Additionally, the Defendants' unlawful conduct raised, fixed, maintained, and stabilized gasoline and diesel fuel prices in the State of

Rhode Island at artificially high levels. Throughout the Class Period, the Defendants' illegal conduct substantially affected commerce in the State of Rhode Island.

201.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws §6-36-7 *et seq.* Th Plaintiffs and Members of the Class seek all relief available under R.I. Gen. Laws §6-36-7 *et seq.*

202.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws §6-13.1-1, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNTS 42 & 43: SOUTH DAKOTA**

**(Class Members that Purchased Gasoline or Diesel Fuel in South Dakota)**

203.    By reason of their actions and actions of co-conspirators, gasoline prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring the Plaintiffs and the Class. Throughout the Class Period, price competition in the market for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout South Dakota. Throughout the Class Period, the Defendants' illegal conduct substantially affected commerce in the State of South Dakota. The Plaintiffs and members of the Class, including those who resided in the State of South Dakota and purchased gasoline or diesel fuel there, paid supra-competitive, artificially inflated prices for their gasoline and/or diesel fuel.

204.    The Defendants have violated S.D. Codified Laws §37-1-3.1 *et seq.,* through their anticompetitive actions. Therefore, Plaintiffs and members of the Class seek all forms of relief available under S.D. Codified Laws §37-1-3.1 *et seq.*

205.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §37-24-1 *et seq.,* and, therefore, the Plaintiffs and members of the Class seek all relief available under that statute.

**COUNT 44: TENNESSEE**

**(Class Members that Purchased Gasoline or Diesel Fuel in Tennessee)**

206.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code §47-25-101 *et seq.* The Defendants' combinations or conspiracies had the following effects: (1) price competition for the sale of gasoline and diesel fuel, tangible goods, was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for gasoline and diesel fuel, tangible goods, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Throughout the Class Period, the Defendants' illegal conduct substantially affected commerce in the State of Tennessee. Therefore, the Plaintiffs and members of the Class seek all forms of relief available under Tenn. Code §47-25-101 *et seq.*

**COUNT 45: UTAH**

**(Class Members that Purchased Gasoline or Diesel Fuel in Utah)**

207.    The Defendants violated the Utah Code §76-10-3101 *et seq.* by entering into unlawful agreement in restraint of trade in the State of Utah. Specifically, the Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Utah for the crude oil, gasoline, and diesel fuel market by restraining, suppressing, and eliminating competition. Additionally, the Defendants' unlawful conduct raised, fixed, maintained, and stabilized gasoline and diesel fuel prices in Utah at artificially high levels. Throughout the Class Period, the Defendants' illegal conduct substantially affected commerce in the State of Utah. Therefore, the Plaintiffs and Members of the Class seek all relief available under Utah Code §76-10-3101 *et seq.*

**COUNT 46: VERMONT**

**(Class Members that Purchased Gasoline or Diesel Fuel in Vermont)**

208.    The Defendants combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated

throughout the State of Vermont; (2) gasoline and diesel fuel prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. The Defendants have entered into an unlawful agreement in restraint of trade in violation of Vt. Stat. Tit. 9, §2453 *et seq.* Throughout the Class Period, the Defendants' illegal conduct substantially affected commerce in the State of Vermont. The Plaintiffs and members of the Class seek all forms of relief available under Vt. Stat. Tit. 9, §2465.

## X.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of itself and the Classes of all others so similarly situated, respectfully requests that:

A. The Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(3), appoint Plaintiffs as Class Representatives and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Classes, once certified;

B. The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal as a quick look or full-fledged rule of reason violation) of various state antitrust and competition laws as alleged above;

C. The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or  following any practice, plan, program, or device having a similar purpose or effect;

D.    The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.    The Court award Plaintiffs and members of the Classes such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## XI.    <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: October 3, 2024

By: */s/ Mary T. Torres*
Mary T. Torres – NM Bar # 7279
Law Offices of Mary Torres
201 Third Street NW, Suite 1950
Albuquerque, NM 87102
Telephone: (505) 944-9030
Facsimile: (505) 944-9091
Email: Mtt@marytorreslaw.com

By: */s/Karin B. Swope*
KARIN B. SWOPE (*Pro Hac Vice*)
ELLEN WEN (*Pro Hac Vice*)
**COTCHETT, PITRE & McCARTHY,**
999 Northlake Way Ste 215
Seattle, WA 98103
Telephone: (206) 778-2123
Facsimile: (650) 697-0577
Email: kswope@cpmlegal.com
        Ewen@cpmlegal.com

JOSEPH W. COTCHETT (*Pro Hac Vice*)
ADAM ZAPALA (*Pro Hac Vice* )
VASTI S. MONTIEL (*Pro Hac Vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road Burlingame, CA 94010
Telephone: (650) 697-6000
Fac: (650) 697-0577
Email: jcotchett@cpmlegal.com
azapala@cpmlegal.com
vmontiel@cpmlegal.com

*Counsel for San Mateo County and City of San Jose*

Attorneys for Public Entities:

COUNTY OF SAN MATEO
John D. Nibbelin, County Counsel
David A. Silberman, Assistant County Counsel
Brian J. Wong, Legal Deputy County Counsel
500 County Center, 4th Floor
Redwood City CA 94063-1664
Telephone: (650) 363-4749
Facsimile: (650) 363-4034
Email: jnibbelin@smcgov.org
Email: dsilberman@smcgov.org
Email: bwong@smcgov.org

CITY OF SAN JOSE
Nora Frimann, City Attorney
Ardell Johnson, Assistant City Attorney
200 E. Santa Clara St.
San Jose CA, 95113-1905
Telephone: (408) 535-1900
Facsimile:  (408) 998-3131
Email: nora.frimann@sanjoseca.gov
Email: ardell.johnson@sanjoseca.gov